172 So.2d 812

**Joe RAMSEY**

v.

**CITY OF HUNTSVILLE.**

**8 Div. 970.**

Court of Appeals of Alabama.

March 9, 1965.

Joe M. Berry, Cloud, Berry & Ables, Huntsville, for appellant.

Charles C. King, Asst. City Atty., Huntsville, for appellee.

PRICE, Presiding Judge.

Appellant was convicted in the City Court of Huntsville for a violation of a city ordinance which reads:

"It shall be unlawful for any person who has not been licensed to do so under the appropriate provisions of this chapter, to sell, offer for sale, or have possession for sale, any liquor or malt or brewed beverages or alcoholic beverages."

On appeal to the circuit court his jury trial resulted in a conviction. A fine of $100 and a sentence of six-months at hard labor were imposed. The trial judge ex mero motu placed the defendant on probation for five years.

The evidence discloses that on Sunday, February 17, 1963, about 2:30 in the afternoon, Officers Lee, Gold and Crabtree went to 122 Abington Avenue in the City of Huntsville. The premises located at this address were described as a long building, like a restaurant or store, bordering directly on the sidewalk, with a double door in the center and large plate glass windows on each side.

As the officers stopped in front of the building they noticed a man standing in the doorway, with the door half open, talking to a girl on the sidewalk. When they saw the officers the man and girl went into the building and shut the door. The officers rang the bell for about five minutes before the door was opened.

Chief of Detectives Lee testified 20 or 25 men and women were sitting around in the front room. These people were searched and more police cars were called to take them to jail. Defendant came out of a back room, shut the door behind him and went into a restroom. The officer followed him into the bathroom. Two other persons were in the restroom. There was an odor of alcoholic beverages and a drinking glass was lying in the commode, which was in the process of flushing.

Chief Lee asked defendant for a key to the back room he had just come from. Defendant said he didn't have a key and the door was forced open. The officers went into the room, followed by defendant. Just inside the room by the door there was a table with a cash register on it. On a table on the other side of the door there was a foot tub and a dish pan, both about full of water. Witness asked defendant about the water in the tub and pan. He replied, "That's where I wash my glasses." The officer asked, "Glasses for what? What do you use it for?" Defendant said, "Oh, you know." A big cooler or refrigerator contained several six-packs of different brands of beer. A lid or false top of a table was raised and several pints of whiskey were found in the opening. Officer Lee testified: "I asked defendant, 'Joe, do you mind opening this cash register?' He said, 'I don't know how.' I said, 'Well, Joe, go ahead and try and I'll show you how to open it.' He said, 'All right.' I said, 'Push this key here.' He pushed the key and the cash register flew open. I said, 'How much money is in there.' He said, 'I don't have no idea.' I said, 'Well, count it and see.' He started counting it and said, 'Oh hell, I can't count it, you count it for me.' I said, 'You stand here and I'll be glad to count it for you.' "

Witness counted the money which amounted to $75.00 in 10's and 5's, almost $50.00 in 1's, and around $35.00 in halves, quarters, dimes and nickels. Ramsey was arrested and taken to city hall. As they were getting into the police car defendant saw a man named Emmett Sisk standing by a tree and called to him, "Emmett, take care of the place and look after the money. I have to go up. I'll be back in a little while." The man "said he wasn't having a damn thing to do with the place." For the purposes of identification Officer Lee wrote the name "Bob Sisk" on the cartons of beer taken from the premises. He testified that Bob Sisk was the owner of the property where the beer and whiskey was confiscated.

Officer Gold testified he was the last of the three to enter the building. When he got inside defendant was standing about in the center of the front room. Some 23 people were there. About five opened beer cans were sitting on the floor by the wall. One or two had a little beer in them. A pint bottle about two thirds full of whiskey was sitting behind a big chair.

Officer Crabtree testified when he entered the building he noticed quite a number of people sitting around the room. He saw defendant, Joe Ramsey, coming into the room from the left as you enter the building. After examining the building he saw that defendant came from a restroom back there. Witness went into this restroom but found "nothing." He saw defendant take a partially filled whiskey bottle out of his shirt and put it down behind a chair where another person was sitting. The officer went over and picked up the bottle. Defendant said, "Can't we forget this?" The officer said, "I'm afraid not."

On cross-examination this officer testified he entered the building a step or two behind Chief Lee, and he did not see defendant go into the bathroom at a later time.

The evidence was that the whiskey and beer bore Alabama tax stamps.

It was stipulated that no alcoholic beverage license had been issued to the defendant.

The defendant testified he had been at the raided premises for about an hour when the police arrived. 20 or 25 persons were there. They were watching television, talking and drinking beer. He had bought two cartons of beer at a tavern Saturday afternoon. When the officers came he was standing about the center of the front room and was not coming from the back room. After the officers arrested everybody defendant started out the door with the others but Chief Lee called him back and asked if he had the keys to the back room. Defendant told him he didn't have a key; that the building did not belong to him and he had nothing to do with it. He testified he had always heard Bob Sisk owned the building, but he couldn't swear that he did. Defendant denied making the statements to the officers attributed to him and denied yelling to anyone outside the building, asking him to look after the premises and the money in the cash register. He had nothing to do with the money and didn't know it was in the back room. Mr. Lee asked him to open the cash register and count the money but defendant told him he didn't know how to open it. Mr. Lee or one of the other officers opened it. Defendant said, "I'm not touching the money. You count it yourself, or some of you other people. I'm not bothering the money."

Defendant denied possession or ownership of the whiskey and said he made no effort to sell any of his beer to anyone. After the old Lincoln Club was closed it was a common thing for people to go into this building and every two or three weeks people would congregate there. There is a brick wall between the Lincoln Club building and the former cafe, with no entrance or door between them. Bob Sisk has control and authority over the place and he had told defendant and others they were welcome to go there and drink if

they behaved. At the time of the raid defendant was employed by Mr. Atchley as a carpenter's helper and he has never worked for Bob Sisk in any capacity.

■ On cross-examination the defendant was asked if it wasn't a fact that he was convicted of violating the "City Beverage Control Ordinance of the City of Huntsville" on August 10, 1962, and again on June 29, 1963, and paid $100 fine for each conviction.

Defense counsel objected to these questions on the grounds, among others, that these alleged offenses did not involve moral turpitude and the convictions were for violations of a city ordinance and not a state statute.

The solicitor stated the purposes of the questions were to show defendant's "scheme, design and propensity" for commission of the crime charged.

Objection was again interposed. The court overruled the objection and defendant answered each question in the affirmative.

The court's action constituted reversible error. Such evidence was not admissible to show intent, plan, design or motive. Govan v. State, 40 Ala.App. 482, 115 So. 2d 667.

■ A conviction of selling whiskey does not involve moral turpitude, hence testimony concerning conviction of such offense is inadmissible for purposes of impeaching the character of a witness. Wiggins v. State, 27 Ala.App. 451, 173 So. 890.

In Huggins v. State, 271 Ala. 428, 123 So.2d 911, the court said:

"The statute, § 434, Title 7, Code 1940, relating to the competency and credibility of witnesses as affected by conviction for crime, contemplates only convictions for violation of the state laws, and not convictions for violation of municipal ordinances, * * *."

We are of the opinion the state's evidence was insufficient to sustain the verdict and the judgment rendered. The motion to exclude the evidence should have been granted.

In view of our disposition of this case we find it unnecessary to consider all the matters argued, as they are not likely to arise in the event of another trial. However, we will discuss some of the rulings urged upon us as error.

■ The trial court, on defendant's motion, excluded from the jury the beer and whiskey, evidently because the search was made without a warrant, but admitted testimony concerning the same. The court's reasons for so doing are not clear to us. If the search was illegal the evidence obtained thereby, as well as the fruits of the search, was inadmissible.

But it is well settled that, "When a person disclaims interest in the premises or possessions searched, or in the articles seized, he cannot question the legality of the search and seizure." 79 C.J.S. Searches and Seizures § 60, p. 816. See also 49 Am.Jur., Searches & Seizures, Sec. 11, p. 508; Mixon v. State, (Fla.), 54 So.2d 190.

■ Appellant contends the court's action in placing him on probation for five years, without request by defendant, amounted to punishment in excess of that prescribed by the ordinance.

In Persall v. State, 31 Ala.App. 309, 16 So.2d 332, Justice Simpson, then a member of this court, but now a member of the Supreme Court, said: "A probation is subject to rejection or acceptance by the convict. He has an unfettered election in that regard, and the court order is not effective or operative until it has been accepted by him. If he prefers to serve out his sentence, as originally imposed upon him, to a suspension of it by subjecting himself to the conditions nominated in the probation, he has the clear right to do so."

This statement appears in 24 C.J.S. Criminal Law § 1618(3) at p. 876:

"Probation was never intended to be a device for making punishment more severe than that prescribed by the legislature."

In People v. Billingsley, 59 Cal.App.2d Supp. 846, 139 P.2d 362, the case cited in the above text, the court said:

"The right of a defendant to refuse probation is a necessary safeguard against the possibility that the conditions of probation may be more onerous than the sentence."

Reversed and remanded.

CATES, J., considers that under Code 1940, T. 37, Sec. 599, the Mayor of the city, absent any other statute, is the only repository of the power of suspending execution of a sentence for breach of a city ordinance even though the sentence results from a trial de novo in the circuit court.